THE STATE OF OHIO, APPELLEE, *v.* TAYLOR, APPELLANT.

[Cite as *State v. Taylor* (1993), 66 Ohio St.3d 295.]

(No. 91–2498—Submitted January 19, 1993—Decided May 26, 1993.)

298

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, *Edward Kraus, Timothy J. McGinty, Elaine Welsh* and *L. Christopher Frey*, Assistant Prosecuting Attorneys, for appellee.

*John J. Ricotta* and *Carla M. Tricarichi*, for appellant.

WRIGHT, J. Rayvon Taylor appeals his convictions and sentence of death. As required by R.C. 2929.05(A), we have reviewed Taylor's thirteen propositions of law. For the reasons that follow, we affirm Taylor's conviction on one count of aggravated murder under R.C. 2903.01(B), aggravated robbery, and kidnapping. We reverse his conviction on one count of aggravated murder under R.C. 2903.01(A). We also find the evidence insufficient to sustain Taylor's conviction for the R.C. 2929.04(A)(7) felony murder specification attached to the indictment. Therefore we vacate his death sentence and remand the cause for resentencing on the R.C. 2903.01(B) aggravated murder conviction.

I

In his first proposition of law, Taylor contends that the trial court improperly admitted the hearsay testimony of Robert Adams. Taylor argues that the testimony is inadmissible under Evid.R. 803(2) and violates his right to confront witnesses under the Ohio and United States Constitutions.

Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."

Evid.R. 802 contains the general prohibition against the admission of hearsay. It provides:

"Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio."

The exceptions to this general prohibition are enumerated in Evid.R. 803. Pertinent to this appeal is Evid.R. 803(2), which permits the admission of the following:

"Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

The fact that this otherwise hearsay testimony is admissible is based on the notion that the excited statement maintains a high level of reliability. Professor McCormick is cited in the Staff Note to Evid.R. 803(2):

"This exception derives its guaranty of trustworthiness from the fact that declarant is under such state of emotional shock *that his reflective processes have been stilled.* Therefore, statements made under these circumstances are not likely to be fabricated. McCormick, § 297 (2d ed. 1972)." (Emphasis added.)

A treatise on Ohio evidence law also stresses that an excited utterance must be the product of reactive rather than reflective thinking:

"Reactive excited statements are considered more trustworthy than hearsay generally on the dual grounds that, first, the stimulus renders the declarant incapable of fabrication and, second, the impression on the declarant's memory at the time of the statement is still fresh and intense. Accordingly, Rule 803(2) assumes that excited utterances are not flawed by lapses of memory or risks of insincerity." 1 Weissenberger's Ohio Evidence (1992), Section 803.16. See, also, 4 Louisell & Mueller, Federal Evidence (1980) 491–492, Section 439.

In *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, we established a four-part test to determine the admissibility of a "spontaneous exclamation." [1]

"Such testimony as to a statement or declaration *may be* admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that

---

1. Evid.R. 803(2) is essentially the codification of the common-law exception for spontaneous exclamations. Evid.R. 102 states that the Rules of Evidence "shall be construed to state the common law of Ohio unless the rule clearly indicates that a change is intended * * *." For a discussion of the codification in the Rules of Evidence of the common-law hearsay exception of *res gestae,* of which the excited utterance exception is a part, see *State v. Wallace* (1988), 37 Ohio St.3d 87, 89, 524 N.E.2d 466, 469, fn. 3.

the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration." (Emphasis *sic.*) *Id.* at paragraph two of the syllabus (approved and followed in *State v. Duncan* [1978], 53 Ohio St.2d 215, 7 O.O.3d 380, 373 N.E.2d 1234, paragraph one of the syllabus).[2]

At issue in this case is the second requirement set forth in *Potter* that the statement be made while the declarant is still under the stress of the startling occurrence. Although the trial court conducted a voir dire of Adams prior to allowing his testimony to be presented to the jury, the court did not analyze the testimony under the *Potter* four-part test nor state specific reasons why it found the statements admissible. The court of appeals felt that the startling occurrence was McKissick's discovery of Taylor searching his pants, his fear of attack by Taylor, and the threat by Taylor. The court concluded that the event "put [McKissick] in a state of nervous excitement. From the record evidence, moreover, this nervous excitement continued to dominate McKissick as he relayed the events to Adams." We find this conclusion to be without evidentiary support.

According to Adams, McKissick made statements about Taylor either to Adams or in his presence at three different times on March 12. Each of these occasions must be analyzed separately to determine whether Adams's testimony concerning McKissick's statements are admissible under Evid.R. 803(2).

Adams testified that it was his practice to arrive at a customer's home by 8:00 a.m. He worked for Viola Thomas for two days, Thursday, May 11, and Friday, May 12. On May 12, the day he spoke to McKissick, Taylor answered the door and let Adams in. Taylor then went to sleep on the couch. McKissick and Thomas were also there when Adams arrived. Thomas apparently left for work shortly after Adams arrived.

During the morning McKissick first spoke to Adams concerning Taylor. Adams testified that their conversation went as follows:

---

2. We have continued to follow the *Potter* criteria since adoption of the Rules of Evidence. See *State v. Wallace* (1988), 37 Ohio St.3d 87, 88–90, 524 N.E.2d 466, 469; *State v. Huertas* (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058, 1068.

"Mr. McKissick told me that that night he had spent the night there and Rayvon came into the room where they were and tried to get his pants, so he was awoke, so he asked Rayvon what was he doing with his pants. Rayvon told me he was looking for a cigarette and he said you know I don't smoke cigarettes. I smoke cigars. He said what are you doing with my pants, and Mr. McKissick told me he keeps 2 [*sic*] or $300 on him, so he was trying to get his money, so Rayvon was going to do something to help then, but his grandmother stopped him and Mr. McKissick said that Rayvon told him that he was going to kill him."

Later in the day McKissick ran an errand for Adams. After his return he repeated his statements about Taylor to Adams. Adams testified:

"He was saying Rayvon said he was going to kill him and he would have done something to him then but his grandmother had stopped him, and Rayvon said he was going to kill him and he was saying something about he mentioned this to one of his relatives.

"* * *

"He was saying that Rayvon was mistreating his grandmother and different things he was doing there about how he broke in, and he said he loved Rayvon's grandmother. That's why he was around there."

McKissick left the house in the afternoon and returned in the early evening. Adams testified that it was apparent McKissick had been drinking when he returned in the early evening. Viola Thomas returned from work. At this time McKissick spoke to Thomas about Taylor in Adams's presence. According to Adams, McKissick said:

"Mr. McKissick was telling Mrs. Thomas that Rayvon had slept all day and that he didn't give me a hand, and if he would have given me a hand the price would have been cheaper if he would have helped, and he was saying that again that Rayvon came there that morning to get his pants, to steal his money, and if he hadn't stopped, if she hadn't stopped him, Rayvon, if she hadn't stopped Rayvon, Rayvon would have killed him then and he said that Rayvon said that he was going to kill him."

All of McKissick's statements were made to Adams or in his presence hours after the "startling occurrence." The precise time of the occurrence is not known, but judging from McKissick's statements it took place during the night or early morning hours, because McKissick was awakened in the bedroom. The first statement to Adams was made sometime after 8:00 the following morning and the last statement was made more than twelve hours after the occurrence.

There is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought.

Therefore the passage of time between the statement and the event is relevant but not dispositive of the question. "[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation." *State v. Duncan, supra,* 53 Ohio St.2d at 219–220, 7 O.O.3d at 383, 373 N.E.2d at 1237; *State v. Boston* (1989), 46 Ohio St.3d 108, 117–118, 545 N.E.2d 1220, 1230–1231.

In the present case the *only reference* to McKissick's state of agitation was a brief answer on cross-examination.

"Q. Did he seem real upset to you?

"A. He was upset. He just said he loved Rayvon's grandmother, and if he didn't care for her he wouldn't come around but he wanted to look out for his grandmother."

Merely being "upset" clearly does not meet the standard for admissibility under Evid.R. 803(2) because it does not show that McKissick's statements were not the result of reflective thought. Indeed the balance of Adams's testimony regarding McKissick's statements indicates just the opposite: that McKissick was reflecting on the event and giving a narrative account to Adams which was the result of his reflective thought. McKissick commented on Taylor's laziness for remaining asleep all day instead of assisting Adams to reduce Thomas's bill. The statements included other grievances McKissick had against Taylor which had occurred long before the "startling occurrence" as well as conduct by Taylor that McKissick considered to be detrimental to Taylor's grandmother, Viola Thomas. The comments also included McKissick's conclusion that were it not for the fact of his love for Viola Thomas, he would not continue to visit her home. These statements clearly indicate that McKissick was reflecting on the events of the previous night, considering other aspects of his relationship with Taylor and Taylor's relationship with his grandmother as well as the effect on McKissick's relationship with Thomas.

The absence of evidence to support a finding that McKissick's reflective faculties were still dominated by "nervous excitement" stands in stark contrast with the evidence in other cases in which we have admitted excited utterances. In *State v. Huertas* (1990), 51 Ohio St.3d 22, 553 N.E.2d 1058, we affirmed the admission of a tape-recorded statement made by the victim of a stabbing at the hospital approximately forty-five minutes after he was

stabbed. The evidence was that the declarant was "very agitated," "in serious pain" and "had not calmed down" from the stress of the stabbing. *Id.* at 31, 553 N.E.2d at 1068. In addition, the sound of his voice on the tape indicated he was still in a state of nervous excitement. Under these circumstances we found "ample evidence to support the trial court's finding that the statement was admissible as an excited utterance." *Id.*

In the cases of statements made by children who say they were sexually assaulted, we have upheld the admission of those statements even when made after a substantial lapse of time, but in those cases we have done so because we recognize that children are likely to remain in a state of nervous excitement longer than would an adult. For example, in *State v. Boston, supra*, a two-and-one-half-year-old victim of gross sexual imposition, after visiting her father, was picked up by her mother, fell asleep during the drive home, was put to bed at home, and awoke in the night screaming. We upheld the admission of the child's statements to her mother and held:

"We find this out-of-court statement testified to by the mother, Deidre, was properly admitted by the trial court pursuant to Evid.R. 803(2). Considering the surprise of the assault, its shocking nature, and the age of the declarant, it is reasonable to find that Cynthia, a two-and-one-half-year-old child, was still in a state of excitement at the time of her statement to her mother." *Id.*, 46 Ohio St.3d at 118, 545 N.E.2d at 1231.

This trend of liberalizing the requirements for an excited utterance when applied to young children who are the victims of sexual assault is also based on the recognition of their limited reflective powers. Inability to fully reflect makes it likely that the statements are trustworthy. See *State v. Wallace* (1988), 37 Ohio St.3d 87, 88, 524 N.E.2d 466, 468; *State v. Wagner* (1986), 30 Ohio App.3d 261, 30 OBR 458, 508 N.E.2d 164.

In *Potter,* we stated that "[t]his court does not agree with the suggestion that the application of this exception to the hearsay rule or of any of its limitations should be left 'absolutely to the determination of the trial court.'" 162 Ohio St. at 499, 55 O.O. at 394, 124 N.E.2d at 146. We recognized that a variety of factors may be involved in determining the trustworthiness of an excited utterance:

"There may be instances in which a decision to reject such a declaration will appear to a reviewing court almost as reasonable as a decision to admit it; and vice versa. We certainly do not believe that the decision of the trial judge in such an instance should be disturbed.

" * * * [T]he trial judge, in determining whether this declaration was admissible, necessarily had to decide certain questions of fact. If his decision of those questions of fact, as reflected in his ruling on the admissibility of this

declaration, was a reasonable decision, an appellate court should not disturb it. In other words, we believe that the decision of the trial judge, in determining whether or not a declaration should be admissible under the spontaneous exclamations exception to the hearsay rule, should be sustained where such decision appears to be a reasonable one, even though the reviewing court, if sitting as a trial court, would have made a different decision. * * * * " *Potter, supra,* 162 Ohio St. at 499–500, 55 O.O. at 394–395, 124 N.E.2d at 146–147.

In the present case based on the evidence in the record, we cannot say that the decision of the trial court to admit the disputed testimony was reasonable. The evidence is insufficient to find that when McKissick made his statements to Adams he was under the stress of excitement caused by the startling occurrence rather than that the statements were the narrative result of reflective thought.

Therefore we find Taylor's first proposition of law to be well taken.

## II

We will next discuss Taylor's third proposition of law, since our holding above substantially affects our analysis. In this proposition, Taylor argues that the evidence was insufficient to establish the R.C. 2929.04(A)(7) death penalty specification attached to each count of aggravated murder. Taylor alleges there is no evidence that he was the principal offender, nor evidence that he committed the offense with prior calculation and design. Our inquiry must focus on whether the evidence could reasonably support a finding of guilt beyond a reasonable doubt. The relevant question in this evaluation is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2788–2789, 61 L.Ed.2d 560, 573.

Before considering the sufficiency of the evidence concerning the death penalty specification, we will discuss the underlying aggravated murder convictions. Taylor was convicted of two counts of aggravated murder: one count under R.C. 2903.01(A), for which the state must show Taylor acted with prior calculation and design, and one count under R.C. 2903.01(B), for which the state in this case must show the murder was caused while Taylor committed or attempted to commit aggravated robbery.

At trial, in its brief before this court and at oral argument, the state made clear that the linchpin of its theory of prior calculation and design was the testimony of Adams concerning Taylor's alleged threats to McKissick. For example, the state argued before the trial court that Adams's testimony should be admitted because "[i]t's circumstantial evidence showing the motive

and the intent. This is the only way we can present evidence of prior calculation and design." [3]

Because we find that the proffered double hearsay testimony of Adams concerning McKissick's statements to Adams did not qualify as an excited utterance under Evid.R. 803(2) and therefore lacked the requisite indicia of trustworthiness to be an exception to the hearsay rule, the testimony of Adams was improperly admitted. After removal of this linchpin testimony, there is insufficient evidence to sustain a finding of prior calculation and design. Therefore, we reverse Taylor's conviction for aggravated murder under R.C. 2903.01(A), since there was not "substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus.

With regard to Taylor's conviction of aggravated murder under R.C. 2903.-01(B), there is sufficient evidence to find that Taylor aided and abetted Turnage in the murder, which was committed during an aggravated robbery. R.C. 2923.03 provides that if a person, acting with the culpability required for the commission of an offense, aids or abets another in committing the offense, then that person is guilty of complicity in the commission of the offense and shall be prosecuted and punished "as if" he were a principal offender. R.C. 2923.03(A)(2) and (F). An aider and abettor's purpose to kill may be inferred, but not conclusively, where he engaged in a common design with others to commit the offense by force or violence. R.C. 2903.01(D).

There is ample evidence contained in Taylor's oral and written statements to support a finding that he was an aider and abettor. He was present when Turnage struck McKissick and helped carry his body to the van and dispose of it. There was circumstantial evidence McKissick was still alive when he was placed in the van. Therefore, Taylor was properly prosecuted and punished "as if" he were a principal in his conviction under R.C. 2903.01(B).

To impose the death penalty, the state must also prove one of the specifications contained in R.C. 2929.04(A).

R.C. 2929.04(A) provides in relevant part:

"Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the

---

3. The prosecutor subsequently denied saying that Adams's testimony was the only way the state could prove prior calculation and design. However, the state's reliance on this testimony to prove prior calculation and design is evident from its brief and argument before this court as well.

indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:

"* * * *

"(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."

As we stated in *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746:

"Prior calculation and design is an aggravating circumstance only in the case of an offender who did not personally kill the victim. Thus, the criteria set forth in R.C. 2929.04(A)(7) are constructed in the alternative. If the aggravated murder was committed during the course of one of the enumerated felonies, then the death penalty may be imposed only where the defendant was the principal offender (*i.e.*, the actual killer), or where the defendant was not the principal offender, if he committed the murder with prior calculation and design. * * * "

As already discussed, without the improperly admitted testimony of Adams the evidence is insufficient to find prior calculation and design. Therefore, to impose the death penalty Taylor must be found to have been the principal. However, the state never seriously argued that Taylor was the principal. The jury verdict forms concerning the R.C. 2929.04(A)(7) specification required the jury to decide only whether the murder was committed with prior calculation and design. The form did not make any reference to the jury's determining whether Taylor was the principal offender. Indeed, there is no evidence that he was the principal. Turnage admitted that he struck the blows and there is no evidence to the contrary.

In its analysis of this proposition of law the court of appeals refers to Taylor's role as an aider and abettor and cites the provision in R.C. 2923.03 that permits prosecution "as if" the defendant were "a principal offender." It is unclear what conclusion the court of appeals seeks to reach by citing this statute. If the court of appeals refers to R.C. 2923.03 to show that Taylor was properly convicted of aggravated murder under R.C. 2903.01(B) as an aider and abettor, we agree. If, however, the court of appeals concludes that a defendant can be convicted of a death penalty specification under R.C. 2929.04(A)(7) as "the" principal offender through an extension of R.C. 2923.-03(F)'s provision that an aider and abettor can be prosecuted and punished as if he were "a" principal offender, we disagree.

The fact that, pursuant to R.C. 2923.03(F), a defendant who aids and abets another in committing an offense "shall be prosecuted and punished as if he were a principal offender" and so may be convicted of aggravated murder under R.C. 2903.01(B) does not make the defendant "the principal offender" for purposes of imposing the death penalty under R.C. 2929.04(A)(7). To be eligible for the death penalty under R.C. 2929.04(A)(7) as "the principal offender," the defendant must have been the actual killer. *State v. Penix, supra,* 32 Ohio St.3d at 371, 513 N.E.2d at 746. As we stated in *Penix,* being "the principal offender" for purposes of R.C. 2929.04(A)(7) equates to being the actual killer. *Id.* So while Taylor can be convicted of aggravated murder in violation of R.C. 2903.01(B) without being the actual killer, but by aiding and abetting the actual killer, that finding cannot be bootstrapped into a finding that he is the principal offender for purposes of receiving the death penalty under R.C. 2929.04(A)(7).

For the foregoing reasons we find Taylor's third proposition of law well taken.

## III

We have considered the remainder of Taylor's propositions of law. (See Appendix, *infra.*) They are either moot based on our rulings under propositions of law one and three or are not well taken based on previous decisions of this court. Taylor's second proposition of law is not well taken based on *State v. Broom* (1988), 40 Ohio St.3d 277, 281–283, 533 N.E.2d 682, 689–690. Taylor's fourth proposition of law is moot. His fifth proposition of law is not well taken under *State v. Williams* (1988), 38 Ohio St.3d 346, 354, 528 N.E.2d 910, 919–920.

Taylor's sixth proposition of law is not well taken based on *State v. Thompson* (1987), 33 Ohio St.3d 1, 3–5, 514 N.E.2d 407, 411–412, and *State v. Durr* (1991), 58 Ohio St.3d 86, 94–95, 568 N.E.2d 674, 683–684.

Taylor's allegations of ineffective assistance of counsel contained in the eighth proposition of law are not well taken. He argues that defense counsel failed to object to various errors or was otherwise ineffective with respect to issues discussed in the second, fourth, ninth and twelfth propositions of law. These propositions of law are not well taken or are moot. Therefore any failure by defense counsel to object or to request limiting or curative instructions was of no consequence. Appellant's complaint that counsel did not request an instruction on residual doubt is not well taken based on *State v. Jackson* (1991), 57 Ohio St.3d 29, 565 N.E.2d 549.

The ninth, tenth, eleventh and twelfth propositions, dealing with alleged errors during the penalty phase, are moot. The thirteenth proposition alleg-

ing constitutional violations in Ohio's death penalty statutes is not well taken under *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795.

## IV

Since we are vacating the death penalty, we need not engage in an R.C. 2929.05 analysis. For the reasons stated above we reverse Taylor's conviction of aggravated murder under R.C. 2903.01(A), affirm his conviction under R.C. 2903.01(B) and vacate the death sentence.

We remand this cause to the trial court for re-sentencing on the one count of aggravated murder for which the death sentence may not be imposed.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

MOYER, C.J., A.W. SWEENEY, DOUGLAS, RESNICK, MAHONEY and PFEIFER, JJ., concur.

JOSEPH E. MAHONEY, J., of the Eleventh Appellate District, sitting for F.E. SWEENEY, J.

## APPENDIX

"Proposition of Law I: Where a declarant's utterance is the product of reflective thoughts, such declaration is inadmissible under Ohio Rule of Evidence 803(2), the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article [I], Sections 9 and 16 of the Ohio Constitution.

"Proposition of Law II: The admission of unfairly prejudicial other acts evidence for jury consideration deprives an accused [of] the protections of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article [I], Sections 9 and 16 of the Ohio Constitution.

"Proposition of Law III: The evidence is constitutionally insufficient to sustain a conviction on the felony-murder specification where the appellant was neither the principal offender, nor was the murder committed with prior calculation and design as required pursuant to R.C. § 2929.04(7).

"Proposition of Law IV: R.C. § 2929.04(A)(7) requires that the jury find unanimously that the defendant committed an aggravated murder with prior calculation and design or that the jury find unanimously that the defendant was the principal in the commission of the aggravated murder. Use of the disjunctive by the trial court upon instructing the jury allows a split verdict

which denies the defendant a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 10 of the Ohio Constitution.

"Proposition of Law V: Ohio Revised Code § 2947.051(A), R.C. § 2929.12 and R.C. § 2929.14 do not permit the introduction of victim-impact testimony into evidence where an accused is capitally charged. The introduction of victim-impact evidence is a violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

"Proposition of Law VI: Veiled comments by the prosecutor on the accused's failure to testify are violative of the Fifth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 10 of the Ohio Constitution.

"Proposition of Law VII: Where, during penalty phase argument to the jury, the prosecutor improperly defines the term 'mitigation' and 'principal,' the defendant is denied the protections afforded by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

"Proposition of Law VIII: The failure to object to evidentiary issues and improper jury instructions and to request required jury instructions, in addition to eliciting a co-defendant's inculpatory statement which would otherwise be inadmissible, constitutes a denial of a defendant's right to effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 10 of the Ohio Constitution.

"Proposition of Law IX: Where, in a capital case, an accused is convicted for two alternative indictments of aggravated murder of the same victim, the trial court must order an election of counts upon which the prosecution will proceed prior to the sentencing phase of trial. The failure to so elect is a violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Ohio Constitution.

"Proposition of Law X: During the penalty phase of a capital trial, the prosecutor may not elicit or interject non-statutory aggravating factors through the questioning of a witness. The prosecutor's use of non-statutory aggravating factors deprives a defendant of the right to a fair penalty phase hearing in violation of the Fifth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

"Proposition of Law XI: The trial court may not instruct a jury during the penalty phase of a capital trial that multiple aggravating circumstances exist where the jury has found the defendant guilty of only one aggravating circumstance. The erroneous instruction deprives the defendant [of] the due process right to a fair hearing as guaranteed by the Fifth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Ohio Constitution.

"Proposition of Law XII: The failure to provide a capital defendant with accurate penalty phase jury instructions in regards to the standard of proof and in defining mitigation deprives the defendant [of] a fair and reliable determination of his sentence in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution.

"Proposition of Law XIII: Imposition of the death sentence violates the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution."